502 F.2d 802
 183 U.S.P.Q. 5
 PACHMAYR GUN WORKS, INC., a corporation, and Firearm
Accessories, Inc., a corporation d/b/a the Mershon
Co., Inc., Plaintiffs-Appellants,
v.
OLIN MATHIESON CHEMICAL CORP. WINCHESTER WESTERN DIVISION, a
corporation, Defendant-Appellee.
PACHMAYR GUN WORKS, INC., a corporation, and Firearm
Accessories, Inc., a corporation d/b/a the Mershon
Co., Inc., Plaintiffs-Appellees,
v.
OLIN MATHIESON CHEMICAL CORP., WINCHESTER WESTERN DIVISION,
a corporation, Defendant-Appellant.
 Nos. 71-2075, 71-2812.
 United States Court of Appeals, Ninth Circuit.
 July 12, 1974.
 
 Robert E. Lyon (argued), Lyon & Lyon, Los Angeles, Cal., for plaintiffs-appellants.
 W. Brown Morton, Jr. (argued), Washington, D.C., Harlan P. Huebner, Huebner & Worrel, Los Angeles, Cal., N. Dale Sayre, McLean, Morton & Boustead, New York City, for defendant-appellee.
 Before BROWNING and ELY, Circuit Judges, and GORDON THOMPSON, Jr., District Judge.*
 OPINION
 GORDON THOMPSON, Jr., District Judge:
 These appeals arise from an action for injunctive relief and damages based on trademark infringement and unfair competition. Jurisdiction was properly laid in the District Court by virtue of the Lanham Act (15 U.S.C. 1051 et seq.) and 28 U.S.C. 1338(a), (b). Jurisdiction here is under 28 U.S.C. 1291 and 15 U.S.C. 1121.
 Plaintiffs appeal from the judgment below holding their two trademarks invalid and request an accounting with respect to the damages awarded on their claim for unfair competition based on misappropriation of confidential information. They also appeal the decisions of the trial court rejecting their claim of palming off and their request for attorneys' fees. The defendant cross appeals the judgment below awarding compensatory and exemplary damages for unfair competition, and likewise requests an accounting of plaintiffs' actual damages connected therewith. We affirm in part, reverse in part, and remand.
 The plaintiffs Pachmayr Gun Works, Inc. (Pachmayr) and Firearm Accessories, Inc. (Firearm), doing business as The Mershon Co., Inc. (Mershon), are related companies engaged in the manufacture, distribution and sale of various firearm accessories. They are probably best known, however, for their firearm recoil pads. These pads are made primarily of rubber and, when fitted to the butt end of a rifle or shotgun, are designed to absorb or redistribute some of the shock that would othewise be transferred directy to the shoulder of the person firing the weapon. The defendant Olin Mathieson Chemical Corporation (Olin), through its Winchester-Western Division (Winchester) is a large and well known manufacturer of firearms and a former customer for plaintiffs' recoil pads.
 Plaintiff Firearm and its predecessors in interest claim use from February 1937 of United States Registered Trademark No. 665,587, for 'Gun Recoil Pads and Gun Butt Plates in Class IX.' The mark evidenced by this registration is comprised of the words 'White Line' and a white line extending around the periphery of the recoil pad. Registration No. 665,587 was originally issued to Mershon Co., Inc., a predecessor to plaintiffs, on August 12, 1958 and later reissued to plaintiff Firearm on June 16, 1959. Plaintiff Pachmayr is licensed to use the trademark 'White Line' by virtue of an agreement between it and Firearm, dated November 17, 1958.
 The 'White Line' trademark was previously the subject of United States Trademark Registration No. 438,519, issued to Mershon Co., Inc., on April 27, 1948. Frank A. Pachmayr, founder of plaintiff Pachmayr Gun Works, and Mershon Co., Inc., locked horns over the validity of Trademark No. 438,519 in the case of Mershon Co., Inc. v. Pachmayr, 220 F.2d 879 (9th Cir. 1955), and upon suffering an adverse decision upholding the trademark's validity, Mr. Pachmayr subsequently purchased the Mershon Company, including all of its assets, good will and trademarks. When the 'White Line' trademark was canceled by the Patent Office in September 1955, due to a failure to file an affidavit of continuous use as required by 15 U.S.C. 1508, Mershon Co., Inc. secured a new registration of the trademark, this time under Registration No. 665,587, the trademark under litigation here.
 Plaintiff Pachmayr was issued United States Trademark Registration No. 817,631 on November 1, 1966, claiming use thereof from 1932. This mark consists of a particular 'multiple-X' pattern on the lateral edges of the plaintiffs' recoil pad. Trademark No. 817,631 is currently unrevoked and uncanceled, although its history of continuous use by plaintiff Pachmayr since 1932 is far from clear.
 For several years prior to August 1959 the plaintiffs conducted what can fairly be characterized as a successful business, based mainly on the marketing and sale of their recoil pads. They used the 'White Line' and multiple-X trademarks in manufacturing and advertising these products and from time to time notified unauthorized users to desist from using these marks under threat of suit. The trial court found that:
 '23. A substantial segment of the gun-oriented public recognized in 1963 that a recoil pad having a white spacer or lamina is a pad made by the plaintiffs.' (Clerk's Record 1972).
 A similar finding of secondary meaning was made by the court with respect to the multiple-X mark found on Pachmayr's Deluxe Model 325 recoil pad.
 Sometime in August 1959 plaintiff Pachmayr proposed to defendant Winchester the idea of selling the defendant's firearms with plaintiffs' recoil pad attached, and after some deliberation, Winchester placed its first order for plaintiffs' Deluxe Model 325 recoil pads in October 1960. Subsequently Winchester continued its orders of plaintiffs' pads so that between 1960 and 1964 it had purchased over 70,000 units.
 As early as August of 1962, defendant Winchester began to actively seek an alternate source for recoil pads. After receiving price quotations from other companies, officials at Winchester determined that a considerable cost savings could be realized and by October 2, 1962, they had made the decision to drop Pachmayr as a supplier at the earliest practicable opportunity. First, however, in an effort to save countless man hours of research, it was decided to obtain a breakdown of the physical properties and characteristics as well as the exact rubber composition of the Pachmayr pad. Mr. Rigby, the defendant's Chief Buyer, was assigned to the task of acquiring this information from Pachmayr. The district court made the following findings relative to this transaction:
 '48. When Winchester began purchasing pads from the plaintiffs, it submitted no specifications in connection with such purchase as it knew what the Pachmayr pad was as far as quality was concerned, and it knew that this was what it wanted. When Winchester requested the statistical information from Pachmayr, it did not do so for the purpose of determining whether the plaintiffs could comply with Winchester's requirements, since it already knew that the plaintiffs' pads were entirely satisfactory and had been used by Winchester without customer complaint for several years.
 49. Winchester wanted to know what the Pachmayr pads consisted of insofar as the qualities of rubber were concerned so that Winchester could copy the pad and set up Winchester's purchase specifications so as to acquire such pads elsewhere.
 50. Pursuant to Mr. Kuenzel's request, Mr. Rigby requested the information from Pachmayr on October 4, 1962. Mr. Rigby knew at that time that the purpose of the requested information was to make it possible for Winchester to secure its pads elsewhere and thus discontinue purchasing from the plaintiffs.
 51. In making the request for information, Mr. Rigby did not divulge to Mr. Pachmayr that the reason for seeking such information was to permit Winchester to copy the plaintiffs' pads.' (C.R. 1678-1679).
 With this confidential information, Winchester was able to finalize its tenative purchase specifications for recoil pads to replace those supplied by plaintiffs. And in late 1963 the defendant submitted such purchase specifications to the B. F. Goodrich and Firestone rubber companies for the purpose of obtaining production quantities of such pads.
 Still later in 1963, defendant Winchester began purchasing recoil pads from manufacturers other than plaintiffs for attachment to its firearms, and in 1964 marketed such weapons with the pads installed. The trial court found that these pads were 'of the same overall appearance as the Deluxe Model pads sold by Pachmayr to Winchester including the white lamina and the multiple 'X' pattern.' (Finding No. 18, C.R.1671). This suit for infringement and unfair competition was instituted December 24, 1964.
 1. Validity of the White Line Trademark.
 The trial court precluded a finding of infringement of the 'White Line' trademark Registration No. 665,587 by holding that the mark was decorative and functional and, therefore, not a proper subject of trademark protection. See Pagliero v. Wallace China Company, Ltd., 198 F.2d 339 (9th Cir. 1952); In re Application of Deister Concentrator Co., 289 F.2d 496, 48 CCPA 952 (1961). In doing so, the Court necessarily disregarded the earlier ruling of this Court in Mershon Co., Inc. v. Pachmayr, supra, which had held the same 'White Line' trademark valid.
 It is conceded that the earlier Mershon case is not res adjudicata relative to this litigation, since the defendant was not a party to that suit. 1B Moore's Federal Practice, P0.405(1). Nonetheless, where faced with a prior ruling of this Court holding a substantially identical trademark valid, it was error to disregard the stare decisis effect of that ruling absent a strong showing that it was 'palpably erroneous' in fact or law. Cold Metal Process Co. v. Republic Steel, 233 F.2d 828, 837 (6th Cir. 1956), cert. denied, 352 U.S. 891, 77 S.Ct. 323, 1 L.Ed.2d 245; Cold Metal Process Co. v. E. W. Bliss Co., 285 F.2d 231, 236 (6th Cir. 1960), cert. denied, 366 U.S. 911, 81 S.Ct. 1085, 6 L.Ed.2d 235 (1961).[1] The principle of stare decisis, Though not absolute, cf. 1B Moore's Fed.Practice, P0.402(3.-1), nn. 7-12, should ordinarily be adhered to in order to give stability and predictability to the law. Moragne v. States Marine Line, 398 U.S. 375, 403, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). It is especially appropriate to follow our prior ruling here where the plaintiffs have expended considerable funds promoting the 'White Line' trademark in reliance on that decision. Id.; Aero Spark Plug Co. v. B. G. Corporation, 130 F.2d 290, 297 (2d Cir. 1939) (Frank, J., concurring).
 
 
 1
 The district judge expressed 'considerable doubt' that the earlier Circuit panel would have held the 'White Line' trademark valid had it been apprised of certain of his findings relative to the segmented construction of plaintiffs' recoil pads, the disclosure of the intermediate white layer in a prior patent, and the widespread use of white spacers on the butt end of firearms for decorative and functional purposes. (Findings No. 24, 25 and 29). However, the record before this Court is devoid of a clear indication of what the prior appellate panel had before it in the way of factual findings. It is conceded by the parties that the trial court here was likewise deprived of the record on appeal in the Mershon case. With the evidence before him in this posture, the trial court could do little more than speculate as to what the Circuit Court might have done had it had the benefit of his considered findings of fact. In our view, this does not amount to a finding of palpable or manifest error that would justify a district court in rejecting the clear holding of a Court of Appeals of the same Circuit. Cf. 1B Moore's Federal Practice, P0.402(1), n. 29 and cases cited; Cold Metal Process Co. v. E. W. Bliss Co., supra, 285 F.2d at 236.
 
 
 2
 It may also be argued that the trial court merely distinguished away the Mershon case on its facts. But on what facts? Again, we are confronted with the lack of the Mershon record on appeal. Without it, neither the district court nor this court is able to state with certainty that the appellate panel in Mershon did not consider the factors which the trial court considered to be distinguishing in the instant case. A fair reading of the Mershon opinion does reveal the Circuit Court's understanding of the segmented method of construction of plaintiffs' recoil pads. 220 F.2d at 880. This method has apparently not changed since 1955. The reported opinion also discloses the Court's careful consideration of the functional versus nonfunctional issue relative to the 'White Line' trademark. 220 F.2d at 882 and 883. The mark was clearly found to be nonfunctional. At the same time, a review of the trial transcript in the earlier case shows that evidence was received concerning the alleged necessity of using an intermediate layer in the manufacture of plaintiffs' pads, and also concerning the use of decorative white spacers in the firearms industry.
 
 
 3
 With the issue thus raised on such an uncertain record, we are unable to hold that the cases, as presented here, are clearly so different on their facts as to require different results. We, therefore, conclude that Mershon Co., Inc. v. Pachmayr, supra, is controlling on the issue of validity of the 'White Line' trademark. We express no opinion, however, as to whether infringement was proved, since the defendant was not afforded the opportunity to present evidence in support of its various defenses thereto at time of trial. (Finding No. 37).
 
 
 4
 We add in passing, that the cases of Sears Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964) were amply discussed and put in proper perspective by Judge Smith of the Court of Customs and Patent Appeals in his concurring opinion in Application of Mogen David Wine Corporation, 372 F.2d 539, 542-545, 54 CCPA 1086 (1967), and that those cases have no application here that might affect the validity of the 'White Line' trademark.
 
 
 5
 2. Validity of the Multiple-X Trademark.
 
 
 6
 The lower Court's ruling that the multiple-X trademark (Registration No. 187,631) is invalid stands on a different footing than its ruling on the 'White Line' trademark above. For there was no prior holding by this Court that the multiple-X design was a valid trademark as a matter of law. Therefore, the trial court was not bound by precedent but was free to make original findings of fact that cannot be overturned on appeal unless 'clearly erroneous.' Rule 52(a), Federal Rules of Civil Procedure. The burden is on the party appealing a given issue to point out specifically where the findings are clearly erroneous. Glens Falls Indemnity Co. v. United States ex rel. Westinghouse Electric Supply Co., 229 F.2d 370 (9th Cir. 1956).
 
 
 7
 The crucial factual finding here was that the multiple-X design performed an important function of distributing the volume of rubber in the plaintiffs' recoil pad in relation to the air space necessary to give the pad the desired shock absorbing capacity. This was fatal to the plaintiffs' claim, since the law is settled that an essentially functional feature of a product cannot be the subject of a valid trademark. In re Application of Deister Concentrator Co., supra; In re Application of Mogen David Wine Corp., 328 F.2d 925, 51 CCPA 1260 (1964).
 
 
 8
 Although the evidence on this issue was highly controverted, we are unable to conclude that the district court's finding of functionality was without evidentiary support. It is not our function, of course, to consider and weigh the evidence de novo. Bloom v. United States, 272 F.2d 215, 223 (9th Cir. 1959), cert. denied, 365 U.S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1146; Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). We therefore uphold the determination of the trial court that the multiple-X design was essentially functional and, as such, was not a proper subject of trademark protection.
 
 
 9
 3. Unfair Competition-- Misappropriation of Trade Secret.
 
 
 10
 We are likewise constrained to affirm the trial court's judgment that the defendant Winchester engaged in unfair competition when it acquired and used the plaintiffs' secret rubber composition formula to the plaintiffs' detriment. The evidence on this question was admittedly conflicting and the sequence of events complex. Nevertheless, the trial judge very ably detailed the circumstances surrounding the acquisition and disclosure of the secret information and concluded that an implied relationship of trust and confidence arose between Mr. Pachmayr and the defendant's agents with respect to the handling of this specific information. He further concluded that this trust was broken by the defendant's deliberate failure to tell Mr. Pachmayr that the confidential information sought would be used to allow the defendant to copy the plaintiffs' recoil pad, as well as by the subsequent transfer of that information to other potential suppliers. It appears settled that the law of trade secrets is essentially concerned with protecting 'against breach of faith and reprehensible means of learning another's secret.' Restatement of Torts, 757, Comment b, p. 7; Clark v. Bunker, 453 F.2d 1006 (9th Cir. 1972). The trial court found that such a protectable interest existed here.
 
 
 11
 We disagree with the defendant's contention that a specific and judiciallyrecognized relationship had to have been established before plaintiffs were entitled to rely on Winchester's agents to maintain the secrecy of Pachmayr's confidential information. If the various cases cited by the defendant[2] teach us anything, it is that the courts will consider the factual circumstances of each case on an individual basis, to determine whether a confidential relationship may reasonably be implied. For example, in Cloud v. Standard Packaging Corporation, 376 F.2d 384 (7th Cir. 1967), cited by defendant, Judge Fairchild wrote:
 
 
 12
 'Where the facts show that a disclosure is made in order to further a particular relationship, a relationship of confidence may be implied, e.g., disclosure to a prospective purchaser to enable him to appraise the value of the secret, disclosure to a prospective lender to assure him of the prospects of a borrower's business, disclosure to agent, partner, or joint adventurer.' 376 F.2d at 388-389.
 
 
 13
 In the instant case, the District Judge, who heard the testimony and observed the demeanor of the several witnesses, was satisfied that as a matter of fact a breach of faith and confidence had been perpetrated amounting to unfair competition. We cannot say that this finding of fact was clearly erroneous. Bloom v. United States, supra; Rule 52(a), F.R.Civ.P.
 
 
 14
 4. Damages.
 
 
 15
 In assessing damages for the tort of unfair competition, the trial court rejected the offer of proof by both sides relative to the actual amount of plaintiffs' loss. He chose instead to estimate the damages in terms of (1) man hours saved by the defendant in researching the plaintiffs' rubber composition formula, (2) plaintiffs' lost sales and (3) publication of plaintiffs trade secret. In this manner $5,000.00 was determined to be an appropriate amount for each of the above elements of damage. In addition, $50,000.00 was assessed as exemplary damages upon the court's finding that the defendant was guilty of oppression and fraud within the meaning of California Civil Code, Section 3294.[3] In justifying this action, the district judge expressed his opinion that the man-hours of research saved by the defendant 'cannot be ascertained with precision' and that the plaintiffs' lost profits resulting from the unfair competition did not warrant further litigation on the damage issue. No basis was given for the fixing of damages for publication of plaintiffs' trade secret.
 
 
 16
 We are sympathetic with the trial court's desire to put an early end to what was obviously a very lengthy and complex lawsuit. He may well be correct in his estimates of plaintiffs' actual damages. Further, the additional time and attorneys' fees ultimately required to resolve the precise amount of loss may well result in additional burdens and diminished returns to the respective parties. Nonetheless, we are of the opinion that the parties should have had their day in court on the issue of actual damages and upon remand evidence should be taken either before the court or before a master appointed for that purpose.
 
 
 17
 5. Unfair Competition-- Palming Off.
 
 
 18
 Although the Court made some factual findings relative to the issue of palming off (Findings No. 43-45), it did not specifically reject this claim of unfair competition. By necessary implication, however, it can be determined that the district court did not find merit in this cause of action, since it declined to grant any relief based thereon.
 
 
 19
 Both sides have briefed this issue on appeal. But without the benefit of the views of the trial court, we decline to pass on the question at this time. On remand, the district court will have an opportunity to specify its reasons for rejecting plaintiffs' claim.
 
 
 20
 6. Attorneys' Fees.
 
 
 21
 The trial court's rejection of plaintiffs' claim for attorneys' fees presents to this Court the necessity of reviewing its earlier holdings in National Van Lines v. Dean, 237 F.2d 688 (9 Cir. 1956) and Friend v. H. A. Friend & Co., 416 F.2d 526 (9 Cir. 1969).
 
 
 22
 The Dean case concerned charges of service mark infringement, unfair competition and breach of contract. The plaintiff appealed an adverse judgment below and won a reversal here on the unfair competition claim. In addition to injunctive relief, the Circuit Court held that the plaintiff was entitled to actual and reasonable attorneys' fees incurred in the litigation, finding that the defendant's acts had been 'willful and calculated to trade upon appellant's good will.' 237 F.2d at 694. Dean was later examined by this Court in Maier Brewing Co. v. Fleischmann Distilling Corp., 359 F.2d 156 (en banc 9 Cir., 1966), affirmed, 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), where Judge Duniway, speaking for a unanimous court, thoroughly discredited the case law upon which Dean had relied to award attorneys' fees, 359 F.2d at 160-162, and clearly held that attorneys' fees were not a proper remedy in a suit for trademark infringement brought under the Lanham Act, overruling Wolfe v. National Lead Co., 272 F.2d 867 (9th Cir. 1959). Id., 359 F.2d at 165. However, since he was concerned only with the propriety of an award of attorneys' fees in a Lanham Act trademark infringement action, Judge Duniway merely limited Dean to its actual holding and declined to pass on whether the granting of attorneys' fees in a state unfair competition action was correct. Id.
 
 
 23
 The Friend case involved claims of trademark infringement, unfair competition and false description of merchandise. This Court affirmed awards of damages for unfair competition and false description of merchandise, as well as an award of attorneys' fees, upholding the District Court's reliance on the case of National Van Lines v. Dean, supra. More specifically, the Court found:
 
 
 24
 'The cause of action (in the Dean case) was predicated on a state statute. The Court in Dean, as here, determined the infringer's conduct to have been willful. The narrow holding of the Dean case, then, is that to the extent a plaintiff has a state given cause of action and providing state law does not prohibit attorneys' fees, the awarding of attorneys' fees is permissible. California does provide appellee with such a remedy. Cal.Bus. & Prof.Code, 17082. See High Fidelity Recordings, Inc. v. Audio Fidelity, Inc., 305 F.2d 86 (1962).' 416 F.2d at 534.
 
 
 25
 Assuming the above quotation contains the correct rule with respect to the applicability of California law on this question, cf. Sunbeam Furniture Corp. v. Sunbeam Corp., 191 F.2d 141 (9th Cir. 1941), we are not convinced that California law does in fact provide an award of attorneys' fees to the successful plaintiff in an unfair competition action. In Hornaday v. Hornaday, 95 Cal.App.2d 384, 213 P.2d 91 (1949), Presiding Justice Moore confidently stated that:
 
 
 26
 'The policy of the law of this state that an unsuccessful party to a legal controversy cannot be assessed damages to the extent of the value of the attorney's services employed by his adversary is established by a long line of decisions. These and other authorities disclose a uniform policy of the courts that the unsuccessful litigant shall not in the ordinary contest be required to pay counsel fees incurred by his opponent. The practice of awarding costs and attorney fees for services rendered by a plaintiff who in equity protects, preserves or increases a fund in which many are interested does not alter or depreciate the general rule.' 95 Cal.App.2d at 394, 213 P.2d at 98.
 
 
 27
 This general California rule has been codified in 1021 of the Code of Civil Procedure, which provides, in pertinent part:
 
 
 28
 'Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties.'
 
 
 29
 More recent California cases which have applied 1021 in a manner consistent with the policy stated in Hornaday, include: City of Industry v. Gordon, 29 Cal.App.3d 90, 93, 105 Cal.Rptr. 206 (1972); Isthmian Lines, Inc. v. Schirmer Stevedoring Co., 255 Cal.App.2d 607, 610, 63 Cal.Rptr. 458 (1967); Griggs v. Board of Trustees, 61 Cal.2d 93, 37 Cal.Rptr. 194, 389 P.2d 722 (1964); Freeman v. Goldberg, 55 Cal.2d 622, 12 Cal.Rptr. 668, 361 P.2d 244 (1961); and LeFave v. Dimond, 46 Cal.2d 868, 299 P.2d 858, 60 A.L.R.2d 939 (1956).
 
 
 30
 Admittedly, there are judicially created exceptions to this general rule, namely the 'common fund' equity cases alluded to in Hornaday, supra, and those cases where the negligence of one party requires a second party 'to act in the protection of his interests by bringing or defending an action against a third person.' Prentice v. North American Title Guaranty Corp., 59 Cal.2d 618, 620, 30 Cal.Rptr. 821, 823, 381 P.2d 645, 647 (1963); Vanguard Recording Soc., Inc. v. Fantasy Records, 24 Cal.App.3d 410, 100 Cal.Rptr. 826 (1972). However, plaintiffs do not argue that either of these judicial exceptions is applicable here.
 
 
 31
 Rather, 17082 of the Business and Professions Code is invoked, as in Friend, supra, as a statutory exception to the general rule against awarding attorneys' fees. Section 17082 provides, in pertinent part, as follows:
 
 
 32
 'In any action under this chapter in which judgment is entered against the defendant the plaintiff shall be awarded a reasonable attorney's fee together with the cost of the suit.'
 
 
 33
 However, a careful analysis of the Business and Professions Code and the various and separate legislative acts it contains, makes clear that the quoted language 'this chapter' refers to Chapter 4 of that Code entitled the Unfair Practices Act, which is a piece of legislation which deals almost exclusively with cases of price discrimination, secret rebates and 'loss selling.' See Business and Professions Code 17040-17051; Cf. Harris v. Capitol Records Corp., 64 Cal.2d 454, 50 Cal.Rptr. 539, 413 P.2d 139 (1966).[4] None of the statutory violations set forth in 17040-17051 have been alleged here. From the face of the statute, then, it appears that the attorneys' fee remedy of 17082 is not applicable to the case before us.[5]
 
 
 34
 Further, diligent research by both counsel and the Court has yielded no California case authority that would warrant an expanded application of 17082 to unfair competition actions brought outside the Unfair Practices Act.[6] To the contrary, it appears that the California Supreme Court is generally reluctant to extend any statute beyond its precise terms, where the result would be an additional exception to the general rule against the award of attorneys' fees. See Freeman v. Goldberg, supra, 55 Cal.2d at 625-626, 12 Cal.Rptr. 668, 361 P.2d 244 (construing 834 of the Corporations Code); Griggs v. Board of Trustees, supra, 61 Cal.2d at 99, 37 Cal.Rptr. 194, 389 P.2d 722 (construing 13444 of the Education Code); Anger v. Borden, 38 Cal.2d 136, 145-146, 238 Pac.2d 976 (1951) (construing 796 of the Code of Civil Procedure). Finally, we note that in one case brought clearly under the Unfair Practices Act the Fifth District Court of Appeal demonstrated its reluctance to grant attorneys' fees even where 17082 admittedly applied. Instead it readily upheld the trial court's finding that the parties were equally in violation of the Act and therefore affirmed the rough justice of denying attorneys' fees to either side. Page v. Bakersfield Uniform Co., 239 Cal.App.2d 762, 49 Cal.Rptr. 46 (1966).[7]
 
 
 35
 Nor does National Van Lines v. Dean, supra, provide us with an adequate statutory exception to the well settled rule discussed above. Section 3369 of the California Civil Code,[8] cited therein, merely provides injunctive relief for victims of unfair competition. Nowhere, however, does it specifically provide for the recorvery of attorneys' fees. the recovery of attorneys' fees. has recently cited the Friend case as authority for an award of attorneys' fees in H & J Foods v. Reeder, 477 F.2d 1053 (9th Cir. 1973). However, we also note that in none of this Court's several opinions on this issue, including H & J Foods, Friend, Maier Brewing and the genesis of all, Dean, can there be found any meaningful discussion of 1021 of the Code of Civil Procedure and the substantial body of California case law that has arisen therefrom.[9] Dean itself, of course, did not rely on any California authority at all to award attorneys' fees, but rather turned to the Second and Seventh Circuits for support. 237 F.2d at 694, n. 8. Maier Brewing expressly declined to discuss the merits of the state law issue. Meanwhile, Friend, H & J Foods, and High Fidelity Recordings, Inc. v. Audio Fidelity, Inc., 305 F.2d 86, 89-90 (9th Cir. 1962), all stem from Dean, directly or indirectly.
 
 
 36
 Since we are now satisfied that the courts of California would not make an award of attorneys' fees in an action for unfair competition brought outside the Unfair Practices Act, Business and Professions Code, 17000-17101, and since the aforementioned cases are based, directly or indirectly, upon the opposite premise, we hold that on this question these cases do not reflect the law of this Circuit.[10]
 
 
 37
 Undaunted by the adverse California law on the subject, plaintiffs urge us to adopt an alternate theory in support of an award of attorneys' fees. They contend that under its traditional equity jurisdiction the federal judiciary has the power to fashion such a remedy, despite existing law to the contrary in the forum state.
 
 
 38
 The propriety of invoking the historic equity power of the federal courts has been discussed previously by this Court in Maier Brewing Co. v. Fleischmann Distilling Corp., supra, 359 F.2d 156. There also, the plaintiffs argued, as an alternative, that an award of attorneys' fees could be based upon the traditional equity jurisdiction of the federal courts, citing Sprague v. Ticonic National Bank, 307 U.S. 161, 161-166, 59 S.Ct. 777, 83 L.Ed. 1184 (1939). In discussing this argument, Judge Duniway conceded that the language of Sprague indicated that power existed to grant such an award, 359 F.2d at 164, n. 13, but at the same time limited the application of that power to those 'exceptional' cases of which Justice Frankfurter spoke in the Sprague case.[11] This holding was reexamined by the Supreme Court on grant of certiorari. 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967). Chief Justice Warren, Writing for the majority, approved the Ninth Circuit's limitation of the Sprague case and agreed that 'none of the considerations which supported the exception recognized in Sprague are present here.' 386 U.S. at 720, 86 S.Ct. at 1408.
 
 
 39
 Maier Brewing was an action for deliberate and willful trademark infringement. And although injunctive relief had been prayed for in the complaint, in addition to damages, Judge Duniway concluded that in substance the case presented a tort action (at law), and further that it was not 'so peculiarly heinous' a tort 'as to justify the use of the 'historic equity jurisdiction' to award attorney's fees to the plaintiff.' 359 F.2d at 164.
 
 
 40
 Our case is different from Maier Brewing only with respect to the additional common law counts of unfair competition. As to these, only the trade secrets count has been upheld here. We find nothing about such a cause of action which would place it among those exceptional cases mentioned in Sprague. Nor do we find any overriding federal rule or policy that would be served by ignoring California's general rule against the award of attorneys' fees in this case. See Forest Laboratories, Inc. v. Pillsbury Co., 452 F.2d 621, 628 (7th Cir. 1971); Monolith Portland Midwest Co. v. Kaiser Aluminum, 407 F.2d 288, 298 (9th Cir. 1968); cf. Textron v. Spi-Dell Watch & Jewelry Co., 406 F.2d 544, 545-546 (2d Cir. 1968); Electronics Corp. of Amer. v. Honeywell, Inc., 358 F.Supp. 1230 (D.Mass.1973). The denial of attorneys' fees will be affirmed.
 
 
 41
 The judgment of the trial court is affirmed in part, reversed in part and remanded for further proceedings not inconsistent with this opinion.
 
 
 
 *
 The Honorable Gordon Thompson, Jr., United States District Judge, San Diego, California, sitting by designation
 
 
 [1]
 Although the Cold Metal Process cases involved the validity of a patent, we feel their rationale is equally applicable here. See also, Fox Fur Co. v. Fox Fur Co., 59 F.Supp. 701, 703 (D.Del.1945), a trademark infringement case
 
 
 [2]
 Winston Research Corp. v. 3M Co., 350 F.2d 134 (9th Cir. 1965); Sarkes Tarzian, Inc. v. Audio Devices, Inc., 166 F.Supp. 250 (S.D.Cal., C.D.1958); Architectural Models, Inc. v. Necklason, 264 F.Supp. 312 (N.D.Cal.1967); Cloud v. Standard Packaging Corp., 376 F.2d 384 (7th Cir. 1967); Besly-Welles Corp. v. Balax, Inc., 291 F.Supp. 328 (E.D.Wis.1968); Key West Hand Print Fabrics, Inc. v. Servin, Inc., 269 F.Supp. 605 (S.D.Fla.1966)
 
 
 [3]
 California Civil Code, 3294 provides as follows:
 'In an action for a breach of obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.'
 
 
 [4]
 See generally, McCarthy, Whatever Happened to the Small Business Man?-- The California Unfair Practices Act, 2 U.S.F.Law Rev. 165 (1968)
 
 
 [5]
 The reference in the Friend case to High Fidelity Recordings, Inc. v. Audio Fidelity, Inc., 305 F.2d 86 (9th Cir. 1962), does not, standing alone, provide a satisfactory explanation for the invocation of 17082. It is noted, however, that both Friend and High Fidelity were cases involving claims of false or misleading advertising, potentially actionable under 17500-17508 of the Business and Professions Code. Cf. the prior opinion in the High Fidelity case, found at 283 F.2d 551, at p. 554 (1960). The apparently close numerical relationship between the code sections suggests a possible source of confusion as to the scope of applicability of 17082
 
 
 [6]
 One reason may be the relatively small number of actions brought under the Act itself. One commentator bemoans this paucity of litigation under the California Unfair Practices Act. In his opinion, court-imposed limitations have made the Act less attractive as a vehicle for fighting the anti-competition practices of the retail giants in California. See also, Wilke & Holzheiser, Inc. v. Department of Alcoholic Beverage Control, 65 Cal.2d 349, 363, 55 Cal.Rptr. 23, 33, 420 P.2d 735 (1966)
 
 
 [7]
 One study of the legislative limitations imposed on damage recovery in commercial litigation observed that with respect to the statutory award of attorneys' fees, such as in California Business and Professions Code 16750 and 17082, 'it is apparent that the Legislature has been very selective in allowing such compensation.' Baum, Statutory Controls of Damages in Commercial Transactions, 12 Hastings L.J. 191, 209 (1960)
 
 
 [8]
 3369. Unavailability to enforce penalty, forfeiture, or penal law; exceptions; nuisance; unfair competition; definitions; injunctions, who may prosecute:
 1) Neither specific nor preventive relief can be granted to enforce a penalty or forfeiture in any case, nor to enforce a penal law, except in a case of nuisance or unfair competition. 2) Any person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction. 3) As used in this section, 'unfair competition' shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising and any act denounced by Business and Professions Code Sections 17500 to 17535, inclusive. 4) As used in this section, the term person shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons. 5) Actions for injunction under this section may be prosecuted by the Attorney General or any district attorney in this state in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association or by any person acting for the interests of itself, its members or the general public.
 
 
 [9]
 Although High Fidelity Recordings, Inc. v. Audio Fidelity, Inc., supra at n. 5, 305 F.2d 86, suggests that the attorneys' fee issue was briefed there as to applicable California law, the court chose to rely solely on National Van Lines, Inc. v. Dean to affirm the award
 
 
 [10]
 This portion of the opinion was considered and approved by the court sitting in banc
 
 
 [11]
 These included primarily the 'commonfund' type of case, and variations thereof where the plaintiff's claim engenders a fund or a legal right through the consequences of stare decisis. See Chief Justice Warren's discussion in Fleischmann Distilling Corp. v. Maier Brewing Co., 386 U.S. 714 at 718-719, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), of the limited exceptions to the general rule precluding recovery of attorneys' fees absent a statute or contract providing therefor